## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA
## HARRISBURG DIVISION

### CASE NO.:  1:19-cv-01638-YK

ADLIFE MARKETING &
COMMUNICATIONS CO., INC.,

       Plaintiff,

v.

KARNS PRIME AND FANCY FOOD LTD.
AND AD POST GRAPHICS MEDIA
MARKETING, INC.,

       Defendants.

_____

### DECLARATION OF JOEL ALBRIZIO

I, Joel Albrizio, declare and say:

1.      I am the President and Chief Executive Officer of Plaintiff Adlife Marketing &

Communications Co., Inc. (Adlife). I make this declaration based upon my personal knowledge

in support of Adlife's Motion for Reconsideration of this Court's Order (Doc. No. 60) and

Memorandum (Doc. No. 59) granting defendant's motion to dismiss for failure to prosecute

(Doc. No. 36) and dismissing Adlife's complaint with prejudice. If called upon to testify about

the matters set forth herein my testimony will be substantially as follows.

**Adlife's History**

2.      I earned my Bachelor of Arts degree from Massachusetts College of Art and

Design in 1978. After college I founded J.M. Albrizio, Inc., an advertising and design agency,

and the company that eventually became Adlife. I always loved eating food, cooking food, and

shopping for food, and so I decided to focus my business on specialized advertising and

marketing for wholesale food sales and supermarket retail food sales. I also loved photography

and began to photograph food for the promotions and advertisements we created for our supermarket and wholesale food clients.

3.    In the late nineteen seventies and throughout the eighties and nineties, newspapers, magazines and especially supermarket circulars were the mediums that distributed my clients' messages. We began by producing black and white newspaper advertisements, but quickly moved to color marketing campaigns using printed circulars. We were unique as agencies because of the strong competitive advantage we provided to our clients in the supermarket advertising marketplace: **our food photography**.

4.    In the early 1980's, I began styling and photographing food for our clients' color advertisements, promotions, and circulars. At that time in history, we were among the few companies innovating in this field. It may seem ancient, but in actuality the first newspaper coupon insert was only introduced in 1972. Before the 1970's, color printing was too expensive for local and regional food businesses to afford. However, by the time I graduated college, the costs of high-quality commercial color printing dropped significantly while at the same time demand for supermarket shopping increased tremendously. I quickly realized that our pictures of food were really worth more than a thousand words.

5.    In 1994[1] I formed Adlife and expanded our business to keep up with the demand for our services. At great expense, I installed kitchens for food preparation and styling in our offices. Adlife's photographers created hundreds of thousands of images of all varieties of fresh and prepared foods. Every image in our PreparedFoodPhotos.com library was either photographed by me or created under my direct supervision. And we were ensured that copyright would protect our work.

---

[1] To put this in perspective, the New York Times only began printing in color in 1993. In the nineties, demand for press ready high quality color images for advertising exploded as a result of the movement to all color in print.

6.      Every image in the Adlife food photography library was painstakingly color corrected for optimal use in the four-color printing process, a process that continues to this day to be the most cost effective and efficient means of producing large volumes of color printed material under short deadlines like supermarket circulars. Our images are extremely valuable to anyone in the food or grocery business who still uses commercially printed circulars which is almost all food and grocery retailers and wholesalers. Printed color retail circulars continue to be critical to the success of our clients in these businesses. Images that are not color corrected may look pleasing to the naked eye, but they are basically useless for these purposes.

### Adlife's Business Today

7.      I provide the following information so that the Court understands that the business of Adlife that I manage full time and that I am responsible for is large, diverse, busy, and three-dimensional. We are a full-service advertising agency, not a copyright troll.

8.      The vast majority of Adlife's revenue comes from print and digital advertising services, social media services, and related other income. Believe it or not, the internet has not taken over the grocery store yet. Even during the pandemic, more than 8 in 10 shoppers still frequently check circulars for weekly grocery deals; 87% of shoppers read circulars the same amount or more than they did a year ago, and 74% of shoppers consult their grocery print circular to look for lower priced specials.[2] Adlife is one of only a handful of food image libraries in the world that can serve the needs of grocers and food wholesalers for images to feature in these circulars.

---

[2] See Karen Law, Unprecedented Times Prove Retailer Circulars Remain a Powerful Engagement Tool. https://www.valassis.com/blog/unprecedented-times-prove-retailer-circulars-remain-a-powerful-engagement-tool/ Valassis, a consumer research organization, has researched the shopping habits of millions of consumers and found that if a grocery chain with a circulation of 10 million circulars each week reduced circular distribution by 5% that would translate into a loss of **500,000 households as customers each year**. *Id*.

9.      Adlife's business employs thirty people. Fifteen are graphic artists who create print and digital advertisements for our clients. We employ four sales and customer support representatives, four intellectual property specialists, a social media specialist, three administrative and production support staff, and three officers including me. In previous years we employed over 50 people focused solely on the creation and distribution of printed grocery retail circulars, in-store signage and social media services, but recent years have seen a decline in these areas of our business. The creation of weekly circulars and in-store signage were responsible for most of Adlife's revenues in the past, but over the last four years, as that revenue began to decline, Adlife began offering digital advertising services to its clients, mainly in the form of email marketing.  Presently Adlife has approximately 40 wholesale and retail clients of our advertising services. Prior to 2016, 95% of Adlife's total revenue was generated by the creation and distribution of printed circulars and in-store signage.

10.      Adlife has been the victim of rampant infringement online. Desktop publishing and the internet have decimated Adlife's business and its investment in its copyrights. The unauthorized copying, display and distribution of Adlife's images has grown exponentially since desktop publishing and internet technologies became affordable in the late 1990s and early 2000s. These technologies allowed almost anyone to steal Adlife images by simply right clicking and copying or scanning our images and pasting them wherever they liked, including in promotions, without paying Adlife a penny. Adlife has discovered hundreds of infringers of its images online, and every day Adlife discovers more and more infringement.

11.      Surprisingly, not only have potential customers of Adlife's image licensing and advertising services stolen Adlife's images, so have Adlife's competitors. Companies in our business such as Merlin Printing, Olean Grocery Wholesale, Associated Grocers Of New York,

Buffalo News Press, Gannet, Ad Post and others have copied, displayed and distributed Adlife's images in direct competition with Adlife. Copying is so easy, but it has cost Adlife hundreds of thousands of dollars annually and robbed the employees of Adlife of income and benefits they deserve.

### Adlife's Intellectual Property Enforcement

12.     The problem of rampant online infringement has forced Adlife to hire staff and increase its oversight of unauthorized uses of its images in order to maintain the value of Adlife's intellectual property portfolio and discourage the unauthorized uses that have proliferated. Adlife also engaged the services of outside attorneys, including Mr. Liebowitz and LLF, but not exclusively.

13.     Adlife relied on LLF for updates on our cases and we did not receive them from Pacer or any service that relied on information on Pacer. Adlife relied on its counsel to provide updates on cases, including filing status, upcoming deadlines, pending motions and decisions, and requests for discovery for which Adlife's participation and assistance is required.  Adlife relied upon its attorneys' professional responsibility and duty of candor to keep Adlife truthfully informed of the progress of its cases on an ongoing basis.  I never obtained information or documents from Pacer directly because until November of 2020, I never had any reason to believe that any of Adlife's counsel, including Mr. Liebowitz, had failed to comply with their professional responsibilities to candidly and honestly keep Adlife informed of the progress of Adlife's cases.

14.     Mr. Liebowitz and LLF represented Adlife in copyright infringement litigation for approximately three years prior to November of 2020. While LLF represented Adlife, Mr. Leibowitz was required by Adlife to attend a regular weekly meeting with Adlife's Intellectual Property manager Rebecca Jones during which Mr. Leibowitz was required to provide Ms. Jones

with updates on the progress of our cases. Ms. Jones then provided status update emails to me and CFO Doug Fleurant.

15.     I was never aware that Mr. Liebowitz and LLF failed to produce documents or discovery in this case. LLF had access to all relevant documents regarding the images and copyrights in the lawsuit. LLF had access to our subscription fees and terms of use. Adlife had no knowledge or reason to suspect that these documents had not been produced.

16.     In preparation for making this declaration I read this Court's Memorandum dated February 23, 2021 filed at Doc. No. 59. This Court's Memorandum recited certain matters as fact that are, in truth, not accurate. These matters concern Adlife's awareness of the progress of the litigation in this case, Adlife's participation in the discovery process with its attorneys Richard Liebowitz and James Freeman, the progress of Adlife's litigation in other cases, the actions of Adlife's former counsel Richard Liebowitz and James Freeman taken on behalf of Adlife, the actions of Mr. Liebowitz taken on behalf of his other clients, and the sanctions levied against Mr. Liebowitz by federal courts around the country.

17.     In particular, the Court in its Memorandum discusses the decision of the Northern District of New York in *Adlife Mktg. & Communs. Co. v. Buckingham Bros., LLC,* No. 5:19-CV-0796, 2020 WL 4795287 (N.D.N.Y. Aug. 18, 2020), and at page 9 of Doc. 59 this Court quotes footnote 10 on page 10 of the *Buckingham Bros.* decision wherein the court in that case faulted Adlife for continuing to use Mr. Liebowitz "who has little respect or knowledge of local procedures, violates court orders, lies under oath, and is continuously sanctioned for frivolous lawsuits." This Court went on in its Memorandum on page 9 to conclude that "even if the Court were to accept that Plaintiff had no knowledge of the numerous dismissals of its own cases brought by Mr. Liebowitz or sanctions levied against him prior to his conduct in this case, at a

minimum Plaintiff must have become aware of its counsel's egregious history of misconduct after being served with the sanctions Opinion and Order of June 26, 2020 from the Southern District of New York," which appears to be a reference to the decision in *Usherson v. Bandshell Artist Mgmt.*, No. 19-CV-6368 (JMF), 2020 WL 3483661 (S.D.N.Y. June 26, 2020), in which Mr. Liebowitz was sanctioned, and ordered to serve a copy of that order, either by email or by overnight courier, on every one of his firm's current clients, including Adlife. But, as I state below, **Mr. Liebowitz never served that decision on me or any of my colleagues at Adlife.**

### *Usherson v. Bandshell Artist Mgmt*

18.      I reviewed the July 27, 2020 declaration filed by Richard Liebowitz in the *Usherson* case in which he certifies under penalty of perjury that on July 27, 2020 Mr. Liebowitz served a copy of the order in *Usherson* on "every one of LLF's clients." A copy of that declaration is attached hereto as Exhibit 1.

*19.*      I have carefully and diligently reviewed and searched my email for the period from June 26, 2020 to the present. **I never received an email from Mr. Liebowitz on July 27, 2020 or any other date serving me with the decision in *Usherson*.** In fact, while the *Usherson* decision is mentioned several times in the *Buckingham Bros.* decision, I did not have a copy of the *Usherson* decision in my possession at the time I read the *Buckingham Bros.* decision, and I did not know anything about what happened in *Usherson* until after this court dismissed this case.

### *Adlife Mktg. & Communs. Co. v. Buckingham Bros., LLC*

20.      Mr. Liebowitz never informed me about any problems in the *Buckingham Bros.* case while it was pending. I first learned about the *Buckingham Bros.* decision not from Mr. Liebowitz, but from another one of Adlife's attorneys who works at a different law firm. That lawyer sent me a link to an article online about the *Buckingham Bros.* decision. This is the link:

https://www.techdirt.com/articles/20200821/10012945159/judge-recommends-copyright-troll-richard-liebowitz-be-removed-roll-court-misconduct-default-judgment-case.shtml. I went to the link and read some of the article, and the case at the bottom of the article, and immediately contacted Mr. Liebowitz to find out what happened in the *Buckingham Bros*. case.

21.     On August 21, 2020, after I received the link above, I immediately wrote to Mr. Liebowitz demanding a meeting to discuss the decision. Attached hereto as Exhibit 2 is a true and correct copy of my email exchange with Mr. Liebowitz on August 22, 2020.  In our email exchange Mr. Liebowitz starts off by writing "Yes, this was the case we discussed about. Terrible judge that didn't agree with the $30k in default. We often get $30k on default but this judge is just devaluing copyright laws. Think we ask the Court for $10k?" Mr. Liebowitz's response suggests we previously discussed this case, but I have no memory of any prior discussion with him about the *Buckingham Bros.* case. I have searched my email and found no communications about the decision in *Buckingham Bros.* before the August 21st emails attached.

22.     I then ask Mr. Liebowitz about the court's "statements in which he names cases of Adlife. Page 22 par#10.....I would like to better understand why we dismissed these cases. I believe the dismissals were based on settlements and not incorrect filings. We just need to go over all of this and totally understand everything.......Joel." At that time, for the reasons I indicate below, I knew that all but one of the five Adlife cases referred to by the Court in footnote 10 of the *Buckingham Bros.* decision had been dismissed because those matters settled, not because the filings in those cases were incorrect as the court in *Buckingham Bros.* concluded. The fact that I knew that all but one of the cases listed in footnote 10 were voluntarily dismissed based on settlements, and not because LLF was in "hot water" as the *Buckingham Bros.* court suggested,

provided a basis for me to credit Mr. Liebowitz's explanation for the decision and his assertion

in his email that the decision was an aberration.

23.    **Mr. Liebowitz concluded our email exchange by stating "Yes, might be a**

**corrupt judge.** We can go over on Monday. Everything will be okay." I do not know why Mr.

Liebowitz suggested that the judge in the *Buckingham Bros.* case might be corrupt, but it was a

remark he made often to me. I am not a lawyer. Mr. Liebowitz was my company's lawyer. I

trusted him to be knowledgeable in litigation matters. I now realize that I was mistaken to do so.

24.    I understand that this court may question why I did not immediately fire Mr.

Liebowitz as Adlife's counsel on August 22, 2020 when I learned about the August 18th decision

in *Buckingham Bros.* Hindsight is, as they say, 20/20. But it is important to understand, as

indicated below and in the declarations of Ms. Jones and Mr. Fleurant, that on August 22, 2020,

the *Buckingham Bros.* decision was the only evidence I had that indicated Mr. Liebowitz was

negatively impacting Adlife's interests in a pending case.

25.    On August 22, 2020, I did not know that Mr. Liebowitz had failed to produce

discovery and missed the discovery deadline in this case. On August 22, 2020 I did not know

that Mr. Liebowitz was not admitted to practice law in this district. On August 22, 2020, I did not

know that a motion for summary judgment had been filed in this case. On August 22, 2020, I did

not have the decision in *Usherson* and did not know the full scope of Mr. Liebowitz's misdeeds

there and in other cases.

26.    To the contrary, the day before, on August 21, 2020, I read an article Mr.

Liebowitz sent me entitled "Photographer Wins Landmark Lawsuit Against BuzzFeed"

https://www.rangefinderonline.com/news-features/industry-news/photographer-wins-landmark-

lawsuit-against-buzzfeed/ The article suggested that Mr. Liebowitz was a skilled copyright attorney that won a "landmark lawsuit."

27.     Knowing nothing about Mr. Liebowitz's failures in this case, and knowing nothing about what transpired in *Usherson*, and considering the Court's decision in *Buckingham Bros.,* I attempted to get an explanation from Mr. Liebowitz regarding what happened. He advised me, and Ms. Jones, and Mr. Fleurant, that the decision in *Buckingham Bros.* was on a default motion, that even if a judgment had been obtained it would have probably been uncollectable anyway, and that it was an aberration that I should not be concerned about. He similarly brushed off any other of my concerns as being not worthy of my time. In hindsight I now realize I should have paid more attention and been more forceful. But, again, at the time it seemed to me that I was entitled to accept my attorney's explanation and his professional responsibility to put the best interests of my company first.

### Discovery in *Adlife v. Karns*

28.     This case was filed on September 23, 2019. Before this case was filed, on September 20, 2019, Ms. Jones sent the email attached as Exhibit 3 to Mr. Liebowitz and copied me on it, which was her usual practice. Attached to the email was a PDF document listing the **thirty-six (36) Adlife copyrighted images** that Adlife contended were infringed by Karns a total of **eighty-nine (89) times**. The PDF showed each image, the image name, the copyright registration number, the registration date, the creation date, the publication date, the number of times the image was infringed, and the earliest documented infringement date. The email also contained a link to a shared folder where all the documents supporting Adlife's claims could be found including all the copyright registration certificates, the images infringed, and the infringements discovered.

29.     Mr. Liebowitz never provided me with the complaint to review in this case prior to filing, which was typical. Adlife trusted Mr. Liebowitz to accurately and completely allege Adlife's infringement claims.

30.     On February 3, 2020, Ms. Jones copied me on an email responding to Mr. Liebowitz's request: "Karns would like a spreadsheet of the 22 different copyright registrations and the effective date of each registration. Can you kindly put this together? Thank you so much!" I received Ms. Jones' email and noted that she promptly provided him with the spreadsheet Mr. Liebowitz requested. A true and correct copy of the email correspondence with Mr. Liebowitz on this issue with privileged communications redacted is attached hereto as Exhibit 4. In response, Mr. Liebowitz acknowledged receipt by reply to all.

31.     On February 26, 2020, I responded to an inquiry from Mr. Liebowitz about the number of images at issue in this case. I stated "We already have 59 images. That's a lot of images." A true and correct copy of my email correspondence with Mr. Liebowitz on this issue with privileged communications redacted is attached hereto as Exhibit 5.

32.     On April 13, 2020, Mr. Freeman of LLF sent an email to Ms. Jones and copied me, Mr. Fleurant and Mr. Liebowitz, that attached a second set of discovery requests served by Karns on Adlife on March 13, 2020. I did not pay attention to the date of the attachment. Mr. Freeman asked if Ms. Jones could have a telephone call with him. A calendar invitation was sent for that afternoon to everyone on the email including me and Mr. Liebowitz. The calendar invite is attached hereto as Exhibit 6. The call was held that afternoon and I attended. During the call we provided Mr. Freeman with all the information he requested to respond to the discovery requests from Karns. The next day, April 14, 2020, Donna Halprin, an employee of LLF, sent me

interrogatory answers to sign by HelloSign. I read them, found them to be accurate, and electronically signed them. Attached hereto as Exhibit 7 are the interrogatory answers I signed.

33.     I saw no further updates or requests for discovery in this case from Mr. Liebowitz or Mr. Freeman.  I was never told by Mr. Liebowitz or anyone else at LLF that Adlife failed to produce discovery in this case. I have searched my email and found no such notification from Mr. Liebowitz or anyone else at LLF that Adlife failed to produce discovery to Karns. Mr. Liebowitz and LLF had all Adlife's documents concerning the images at issue in this case and Adlife's copyright registrations before this case was filed. Mr. Liebowitz and LLF had all the information and documents concerning Adlife's subscription fees and terms of service at the latest on February 25, 2020 when Ms. Jones sent Mr. Freeman Adlife's Terms of Use. Whenever Mr. Liebowitz or Mr. Freeman requested documents or information from Adlife we provided whatever we possessed immediately. If anyone at LLF had requested more or different information or documents from us we would have provided those immediately. I never had any reason to believe that Mr. Liebowitz, Mr. Freeman, or LLF were not managing the case or the discovery, until November 13, 2020.

34.     The very first time I was informed of anything approaching the true facts concerning what transpired in this case was on November 15, 2020 when Mr. Liebowitz sent me the email attached hereto as Exhibit 8 with a copy to Doug Fleurant and Rebecca Jones. The email states:

> Hi Joel,
> On the case against Karns, months ago they did a SJ on the issue
> that we did not provide proof of actual damages, but we are going
> for statutory damages, so you do not need to prove actual damages
> for a statutory damages case. So their motion will likely not
> succeed and even if it does you still have the $750-$150,000 for
> statutory for willful infringement. Our response was put on pause,
> as I needed to get a local lawyer in Harrisburg which took some

12

time to get. The judge did not set a time limit on when to get a
local lawyer in Harrisburg. I thought the parties would do a
meditation before having to get a local lawyer in Harrisburg, PA.
Instead of trying to in good faith do a mediation they did a motion
for lack of prosecution, which has almost no shot of winning as the
court never set a time limit to get a local lawyer. In any event, I got
a local lawyer late last week to come in and we responded to them
and told the judge to require the other side to participate in a
mediation. The judge is likely going to set a status conference in
the upcoming few weeks to talk about mediation and to talk about
new discovery deadlines. Karns never produced any documents in
the case so we have a strong argument that they have not engaged
in good faith. The case is taking its course. Let me know if you
want to jump on the phone to discuss more.
Thank you.

Best,
Richard Liebowitz
Liebowitz Law Firm, PLLC
516-233-1660
www.LiebowitzLawFirm.com

35.      The email above was my first notice from anyone at LLF that: a) Mr. Liebowitz

was not admitted to practice law in this court; b) Mr. Liebowitz had not produced the damages

discovery we provided him; c) a motion for lack of prosecution was filed in this case; d) that

discovery deadlines had not been complied with in this case, or e) that a motion for summary

judgment was filed in this case. Mr. Liebowitz also conveniently left out of his email the fact that

he had violated several court orders and lied to me and my colleagues at Adlife about what was

going on in the case since the beginning.

36.      In the decision at page 9 of Doc. 59 the Court states that Adlife "must have

become aware of its counsel's egregious history of his conduct after being served with the

sanctions Opinion and Order of June 26, 2020 from the Southern District of New York."  **Once

again, I never received that decision.** I searched my email, and it is not there. Mr. Liebowitz

did not serve me with it. I was not aware of the history of Mr. Liebowitz's egregious conduct

until Ms. Jones did her own research on Mr. Liebowitz in November of 2020.

37.    The Court's February 23, 2021 Memorandum references several other Adlife cases that were also mentioned in footnote 10 of the *Buckingham Bros*. decision.  The first one is *MyWebGrocer, Inc. v. Adlife Mktg. & Commc'ns Co.,* 383 F. Supp. 3d 307 (D. Vt. 2019). This was a declaratory judgment action for non-infringement asserted by a copyright infringer who Adlife notified was infringing on Adlife's copyrights. MyWebGrocer also asserted a claim under the Vermont Consumer Fraud Act, 9 V.S.A. §§ 2451 et seq. Adlife counterclaimed for infringement and violations of the Vermont Anti-SLAPP statute, 12 V.S.A. § 1041. While it is true that MyWebGrocer accused Adlife of being a "copyright troll," it is also true that MyWebGrocer stole Adlife's copyrighted images and used them without permission or compensation to Adlife. The case was ultimately settled after significant litigation as shown on the docket attached hereto as Exhibit 9, including cross-motions for summary judgment that were denied. The decision denying the parties' cross motions for summary judgment is attached hereto as Exhibit 10. That decision is **unreported**. Rather than proceed to trial, the parties settled. The settlement is confidential.

38.    *Adlife Mktg. & Communications Co., Inc. v. Yoder's Meats, Inc*., No. 20-CV-1313, Dkt. No. 5 (E.D.  Pa.  June 9, 2020) was settled in June of 2020. I was not aware of any procedural or substantive problems with that case. Attached is a redacted settlement statement we received from LLF that indicates Adlife reimbursed LLF for a service of process fee, which contradicts the court's statement in *Buckingham Bros.* that Mr. Liebowitz failed to serve a summons. Also contradicting the court's statement that process was never served is the Response to Order to Show cause filed at Doc. 8 in the *Yoder's Meats* case, and the Proof of Service filed in the *Yoder's Meats* case at Doc. 7, both of which are attached hereto as Exhibit 11.  It appears that the court in the *Buckingham Bros.* case was mistaken about service of process.

39.     *Adlife v. Musser's*, No. 1:19-cv-1828, was settled. Mr. Liebowitz never advised me of any issues in that case, nor did he ever tell me he was not admitted to practice. The court's docket, which is annexed hereto as Exhibit 12, provides no indication of problems other than the notation after the case was filed that Mr. Liebowitz needed special admission to practice.

40.     *Adlife Mktg. & Communications Co., Inc. v. Tops Markets, LLC*, No. 18-CV-1102, Dkt. No. 5 (N.D.N.Y. Nov. 11, 2018), which is mentioned in footnote 10 of the *Buckingham Bros*. decision, was settled in March of 2019 when a marketing company known as Pure Red came forward, indicated that it was the source of the images used by Tops Markets and several other grocery chains, took responsibility for the infringement, and promptly settled with Adlife on behalf of Top's Market and other infringers.

41.     *Adlife Mktg. & Communications Co., Inc. v. Wal-Mart.com USA, LLC*, No. 18-CV-3175[3], District of Colorado, was one of several claims for infringement Adlife asserted against the world's largest retailer that has been a repeat infringer of Adlife's copyrights. The case was settled in March of 2019 and I knew nothing about Mr. Liebowitz's issues complying with the local rules of the District of Colorado.

42.     According to what Mr. Liebowitz told Adlife, *Adlife Mktg. & Communications Co., Inc. v. Acme Markets, Inc*., No. 19-CV-7394 (S.D.N.Y.) was dismissed because Mr. Liebowitz sued the wrong "Acme Markets." I accepted Mr. Liebowitz's explanation since "Acme" is a common corporate name. To this day I do not know whether Mr. Liebowitz was being truthful or not about Acme Markets, but I have no reason to doubt his explanation either.

43.     Adlife terminated LLF and Mr. Liebowitz in November of 2020 from all Adlife's cases including *Adlife v. AD Post Graphics Media Marketing, Inc*., No. 1:19-cv-1701, and if Mr.

---

[3] The decision in Buckingham Bros. contains a typographical error. The correct case number for *Adlife Mktg. & Communications Co., Inc. v. Wal-Mart.com USA, LLC*, is No. 1**8**-CV-3175.

Leibowitz has not withdrawn, he failed to comply with Adlife's termination demand.  Our new counsel, SRIPLAW, took over the case, and filed their appearance on December 3, 2020. An Amended Complaint was filed on our behalf by SRIPLAW on February 22, 2021.

44.     I apologize to Karns, its counsel, and this Court for having to endure Mr. Liebowitz's unprofessional and unethical conduct in this case. If Adlife had known about what was going on in this case while it was occurring, we would have acted. But, once again, no one at Adlife knew Mr. Liebowitz had failed to produce our documents that he had in his possession or cooperate by producing discovery he already possessed until after the discovery deadline passed, after the motion to dismiss for failure to prosecute was filed and responded to, after the motion for summary judgment was filed and responded to, and after Mr. Liebowitz had disobeyed order after order of this court.

I declare under perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on at Mashpee, MA.

_____
Joel Albrizio