# Exhibit 10

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2019 AUG 27 PM 4: 22

CLERK

BY _____
DEPUTY CLERK

MYWEBGROCER, INC.,                          )
                                            )
    Plaintiff and Counterclaim Defendant,   )
                                            )
    v.                                      )        Case No. 5:16-cv-310
                                            )
ADLIFE MARKETING &                          )
COMMUNICATIONS CO., INC.,                   )
                                            )
    Defendant and Counterclaim Plaintiff.   )

**ORDER ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT FILED BY
PLAINTIFF, AND MOTION FOR SUMMARY JUDGMENT FILED BY DEFENDANT
(Docs. 91, 92, 95)**

Plaintiff MyWebGrocer, Inc. ("MyWebGrocer") brings this action seeking a declaratory

judgment for non-infringement of copyright of five photographs that it displayed on websites and

are purportedly owned by Adlife Marketing & Communications Co., Inc. ("Adlife"). (Doc. 10.)

MyWebGrocer also seeks an injunction under the Vermont Consumer Protection Act ("VCPA")

enjoining Adlife from engaging in deceptive trade practices, as well as an award of damages and

attorneys' fees. (*Id.*) Adlife filed an amended counterclaim against MyWebGrocer for copyright

infringement in violation of the Copyright Act ("Copyright Act"), 17 U.S.C. § 501 *et seq.*

(Doc. 47.) Although the counterclaim alleges copyright infringement of five photographs, Adlife

dropped two of the images referenced in MyWebGrocer's amended complaint and added two

additional images. (*Id.*) The seven images in controversy are herein referred to as the "Food

Images."

Three motions for summary judgment are currently pending before the court.

MyWebGrocer moves for partial summary judgment on the issue of liability for copyright

infringement. (Doc. 91.) MyWebGrocer also moves for partial summary judgment on the damages Adlife seeks for copyright infringement. (Doc. 92.) Finally, Adlife moves for summary judgment on the issue of copyright infringement liability and MyWebGrocer's VCPA claim. (Doc. 95.)

### Facts

The following facts are undisputed except when noted. MyWebGrocer is a Vermont corporation which creates and maintains websites for grocery stores. (Doc. 10 ¶¶ 2, 8.) These websites frequently display images of prepared food, which MyWebGrocer licenses from various parties. (*Id.* ¶ 9.) Adlife is an advertising and marketing agency with a principal place of business in Rhode Island. (*Id.* ¶ 3.) Adlife's photographers take still images of food and other grocery items, which are stored in the company's library. (Doc. 47 ¶ 8.) Adlife has entered into licensing agreements with other advertising agencies and retailers who wish to reproduce the images. (*Id.* ¶ 9.)

On July 21, 2016, Adlife President Joel Albrizio sent copyright infringement notices to three of MyWebGrocer's customers for unauthorized use of an Adlife photograph of a beef brisket ("Brisket Photograph"). (Doc. 10-1 at 2–10.) Adlife attached to each of the notices an invoice for $8,000, the purported cost of the infringement. (*Id.*) The customers forwarded the notices to MyWebGrocer. (Doc. 10 ¶ 11.)

On August 19, 2016, MyWebGrocer sent an email to Adlife stating it had likely obtained the rights to the Brisket Photograph in 2003 through the acquisition of certain business assets from NeXpansion, Inc. (*Id.* ¶¶ 12–13.) It also requested that Adlife provide evidence showing that it owned the Brisket Photograph. (*Id.* ¶ 13.) MyWebGrocer stated in the email that it "intends to continue to use the image unless and until Adlife provides evidence" that its use of

2

the Brisket Photograph was unauthorized. (Doc. 95-1 ¶ 41.) However, MyWebGrocer says in its amended complaint that it took down the photograph on the same day (Doc. 10 ¶ 13).

On September 9, 2016, Adlife provided MyWebGrocer with the copyright registration number for a group of 135 images but did not offer evidence that the registration covered the Brisket Photograph. (*Id.* ¶ 14.) That same day, MyWebGrocer sent an email to Mr. Albrizio stating that "Adlife's repeated emails to MyWebGrocer and its customer, while refusing to provide the requested evidence, constitute harassment." (Doc. 95-1 ¶ 43.)

MyWebGrocer also sent Mr. Albrizio a letter on September 14, 2016 requesting: (1) a full list of the photographs for which Adlife alleges copyright infringement by MyWebGrocer; (2) the certificates of copyright registration and corresponding deposit materials for every such image from the U.S. Copyright Office; and (3) a list of all the license agreements Adlife granted for the images. (Doc. 10-2 at 2.) MyWebGrocer stated in the letter that it was having difficulty locating the documents indicating which licenses it had acquired through the 2003 purchase agreement with NeXpansion, Inc. (*Id.*) Following further correspondence between the parties, on September 19, 2016, Adlife sent a copyright infringement notice with an attached invoice for $8,000 to a second customer of MyWebGrocer regarding a photo of a tuna salad sandwich ("Tuna Sandwich Photograph"). (Doc. 10-3 at 2–4.) On November 1, 2016, Adlife informed MyWebGrocer of three additional photographs—of a turkey and ham wrap ("Turkey Ham Wrap Photograph"), a sausage and pasta dish ("Sausage Pasta Photograph"), and pork ribs ("Pork Ribs Photograph")—that were owned by Adlife and used without authorization. (Doc. 10 ¶ 20.)

The following day, MyWebGrocer again asked Adlife for certificates of the copyright registrations and corresponding deposit materials for each of the five photographs in question.

(*Id.* ¶ 21.) MyWebGrocer states negotiations between the parties broke down when Adlife insisted that MyWebGrocer pay $7,500 in damages and enter into a licensing agreement for access to Adlife's food photograph database at a cost of $999 per month for a minimum of 36 months. (*Id.* ¶¶ 22–23.) Adlife denies these claims. (Doc. 47 ¶ 22–23.) On November 18, 2016, Mr. Albrizio sent MyWebGrocer an email stating "[i]t is clear to Adlife now these images are now and always were without proper licensing," and that "Adlife has decided to pursue the willful infringement claims individually one retailer at a time." (Doc. 10-5 at 2.) That same day, MyWebGrocer filed a complaint in this court seeking declaratory relief for non-infringement of copyright against Adlife. (Doc. 1.)

On December 12, 2016, Adlife provided MyWebGrocer with the copyright registration certificates and corresponding deposit materials for the five images included in its complaint. (Doc. 10 ¶ 30.) The following day, MyWebGrocer sent Adlife information pertaining to its licenses for the Brisket Photograph and Tuna Sandwich Photograph, which it says were obtained through an entity called iStock. (*Id.* ¶ 31.) Adlife stated in its answer to MyWebGrocer's initial complaint that it has, "in the past," licensed some of its images to iStock and MultiAd, the latter of which is now called Creative Outlet. (Doc. 5 at 12 ¶ 18.) On January 31, 2018, Adlife filed an amended counterclaim alleging MyWebGrocer had infringed the copyrights to five of its images. (Doc. 47.) Adlife did not include the Brisket Photograph and Tuna Sandwich Photograph in the counterclaim but added two other images of mangoes ("Mangoes Photograph") and of cherries ("Cherries Photograph"). (*Id.* ¶¶ 39–41, at 18–19.)

## Analysis

### I.    Summary Judgment Standard

Summary judgment is proper if the moving party "shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In deciding whether there is a

genuine dispute of material fact, the court "construe[s] the evidence in the light most favorable to

the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Tracy v.

Freshwater*, 623 F.3d 90, 95 (2d Cir. 2010); *see also Vugo, Inc. v. City of N.Y.*, 931 F.3d 42, 48

(2d Cir. 2019) ("[W]hen considering cross-motions for summary judgment, 'all reasonable

inferences must be drawn against the party whose motion is under consideration' (quoting

*Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001))).

Initially the burden is on the moving party to demonstrate the absence of a genuine issue

of material fact. *Celotex*, 477 U.S. at 323. Once a properly supported motion has been made, the

burden shifts to the nonmoving party to set out specific facts showing a genuine issue for trial.

*Cifarelli v. Vill. of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996).

## II.     Liability for Copyright Infringement Claims

In the amended complaint, MyWebGrocer seeks declaratory relief on the grounds that it

has a reasonable apprehension that Adlife will bring suit for copyright infringement. (Doc.

10 ¶¶ 39–43.) MyWebGrocer argues it did not infringe any copyrights owned by Adlife through

use of the Food Images. (*Id.* ¶ 41.) In the alternative, MyWebGrocer maintains that any

infringement was not willful and therefore remedies for such infringement should not exceed

market value. (*Id.* ¶ 42.) In its counterclaim, Adlife alleges MyWebGrocer's unauthorized use of

the Food Images violated the Copyright Act. (Doc. 47 ¶ 41, at 18–19.)

MyWebGrocer moves for partial summary judgment on both parties' claims, asserting

that the Food Images are not sufficiently original to warrant copyright protection and that Adlife

cannot prove it owns valid copyrights to the images. (Doc. 91 at 5–6.) MyWebGrocer also

contends that it had valid licenses for several of the Food Images and that it did not display two of the other images. (*Id.* at 6.) Adlife also moves for summary judgment on both copyright infringement claims, arguing that MyWebGrocer's licenses were not valid at the time the infringement occurred, and that even if they were valid, MyWebGrocer's use of the Food Images exceeded the scope of the licenses. (Doc. 95-37 at 9–10.)

To establish a claim for copyright infringement, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *accord Kwan v. Schlein*, 634 F.3d 224, 229 (2d Cir. 2011). The court need not discuss the second element because there is a genuine dispute regarding whether Adlife possesses valid copyrights covering the Food Images.

As an initial matter, Adlife argues that "[t]he Copyright Act makes a certificate of registration from the U.S. Register of Copyrights *prima facie* evidence of the valid ownership of a copyright." (Doc. 95-37 at 12.) This reading of the statute is only partially correct and ignores an issue relevant to this case. The Copyright Act states that:

> [T]he certificate of a registration made before or within five years after first publication of the work shall constitute *prima facie* evidence of the validity of the copyright and of the facts stated in the certificate. The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court.

17 U.S.C. § 410(c).

In this case, the length of time between first publication and copyright registration of the Food Images exceeded well over five years—in fact, none of the images were registered with the U.S. Copyright Office within 11 years of when they were first published. (*See* Doc. 107 ¶¶ 17–88.) Thus, the certificates covering the Food Images do not constitute *prima facie* evidence of

6

valid copyrights. *See* 17 U.S.C. § 410(c); 4 Nimmer on Copyright § 12.11[A][1].

Furthermore, "[t]he Copyright Office's scrutiny of an article for registration is not like the intense and prolonged scrutiny required for patent and trademark registration." *Carol Barnhart Inc. v. Econ. Cover Corp.*, 594 F. Supp. 364, 367 (E.D.N.Y. 1984), *aff'd*, 773 F.2d 411 (2d Cir. 1985). In a letter to the Second Circuit, the Copyright Office explained that the examination of copyright applications is "necessarily limited," and that the Office "will register adverse claims by more than one party." *Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149, 166 (2d Cir. 2003) (citing letter from Marybeth Peters, Register of Copyrights, to Roseann MacKechnie, Clerk, U.S. Court of Appeals for the Second Circuit (Apr. 8, 2003)). "Elements of copyrightability are viewed as largely legal questions and therefore equally within the expertise of the courts." *Carol Barnhart*, 594 F. Supp. at 367. It is therefore within the discretion of this court to consider other evidence in determining the validity of Adlife's copyright ownership claim.

Adlife also argues that it is the undisputed owner of the copyrights to the Food Images because they were all photographed by W-2 employees of Adlife. (Doc. 95-37 at 13.) Under the Copyright Act, ownership of a copyright is initially vested in the author of the work. 17 U.S.C. § 201(a). However, "[i]n the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise . . . owns all of the rights comprised in the copyright." *Id.* § 201(b). The Copyright Act defines a "work made for hire" in part as "a work prepared by an employee within the scope of his or her employment." *Id.* § 101(b). Although the Copyright Act does not define "employee" or "scope of employment," "[n]othing in the text of the work for hire provisions indicates that Congress used the words 'employee' and 'employment' to describe

anything other than 'the conventional relation of employer and employ[ee].'" *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 740 (1989) (quoting *Kelley v. S. Pac. Co.*, 419 U.S. 318, 323 (1974)).

Adlife's copyright certificates list Mr. Albrizio as the author of six of the seven Food Images. (*See* Doc. 107 ¶¶ 18–87.) The copyright certificate of the seventh image, the Brisket Photograph, identifies the author as David Ciolfi, who worked as a staff photographer and later as a director of photography for Adlife from 1990 to 2000. (Docs. 93-47 ¶ 4; 107 ¶¶ 74–75.) When asked if he had any evidence suggesting Adlife was not the owner of any of the Food Images, Jerry Tarrant, chief operating officer of MyWebGrocer, answered "[m]y only evidence is the fact that they can't provide evidence that they do own it." (Doc. 95-39 at 33.)

MyWebGrocer contends that Adlife's discovery responses regarding the authorship of the Food Images are "internally contradictory" and "inconsistent with the representations of the Copyright Office regarding the creation of the [Food] Images." (Doc. 91 at 20.) It notes that while the copyright certificate lists Mr. Ciolfi as the author of the Brisket Photograph, Adlife stated in an interrogatory that, "[u]pon information and belief, Joel Mr. Albrizio—founder and CEO of Adlife—captured/took the [Food] Images." (Doc. 93-28 at 4.) In a separate interrogatory regarding the identity of the Food Images' authors, Adlife stated that "the requested information is not currently available." (Doc. 93-29 at 3.)

MyWebGrocer also points to Mr. Ciolfi's written affidavit, in which he states that, "[d]uring my entire ten-year tenure at Adlife, I never once saw Joel Albrizio pick up a camera, take a photograph, or have any involvement in the process of taking of images or any part of the technical process of either film or digital photography production." (Doc. 93-47 ¶ 10.) Mr. Ciolfi added that he did not recall taking the Brisket Photograph and that he is "certain" he

8

did not take other images covered by the same copyright registration which are attributed to him. (*Id.* ¶ 19.) Mr. Ciolfi also denied photographing copyrighted images attributed to him that were created in 2007, seven years after he had left Adlife. (Doc. 93-47 ¶¶ 16–17.) Although these images are not at issue in this case, MyWebGrocer argues this evidence further undermines the credibility of the information contained in Adlife's copyright certificates. (*See* Doc. 91 at 16.)

MyWebGrocer asserts that Adlife's ownership claim to the Pork Ribs Photograph and the Mangoes Photograph is "particularly suspect." (Doc. 91 at 17.) These images are attributed to Mr. Albrizio and the copyright certificates list their creation dates as April and June 1994, respectively. (Doc. 107 ¶¶ 20, 53.) But according to an online Radaris profile,[1] Mr. Albrizio only began working as the executive vice president of Adlife in September 1994. (Doc. 93-34 at 3.) Mr. Albrizio's LinkedIn profile also stated that he was president of J.M. Albrizio, Inc. from 1978 until 1994, at which time he became president of Adlife. (Doc. 93-35 at 3.)

Mr. Albrizio responded to some of the inconsistencies highlighted by MyWebGrocer in a June 22, 2018 deposition and in a written affidavit dated March 28, 2019. During the deposition, Mr. Albrizio clarified that he became a W-2 employee of Adlife in 1992 while he was still president of J.M. Albrizio, Inc. (Doc. 107-3 at 3–4.) He said the dates for the online profiles correspond to when he was an "officer" at a company and that he worked with Adlife "for at least a couple of years before I purchased the stock [in Adlife]." (*Id.*) Mr. Albrizio updated his LinkedIn profile sometime on or before August 27, 2018 to state that he began as president of Adlife in 1992. (Docs. 107 ¶ 116; 93-36 at 4.) Adlife contends the updated dates reflect when he

---

[1] Radaris advertises itself as "a comprehensive public records search engine for information about people, properties, businesses and professionals." *What is Radaris?*, Radaris, https://radaris.com (last visited Aug. 27, 2019).

became employed at Adlife rather than when he became president. (Doc. 107 ¶ 116.) Adlife concedes, however, that it does not possess any documentation verifying that Mr. Albrizio began working at Adlife in 1992, nor does it have any W-2 forms for Mr. Albrizio for the years 1992, 1993, 1994, 1997 (registered creation year for Sausage Pasta Photograph), 1999 (registered creation year for Brisket Photograph), 2000 (registered creation year for Cherries Photograph), and 2005 (registered creation year for Tuna Sandwich Photograph and Turkey Ham Wrap Photograph). (*Id.* ¶¶ 118–25.)

Regarding Mr. Ciolfi's statement that he had never seen Mr. Albrizio hold a camera during his ten-year tenure at Adlife, Mr. Albrizio explained in the written affidavit that "I primarily worked on my own and did not work with the staff photography team. My work was not managed or overseen by the Director of Photography." (Doc. 107-5 ¶ 11.) He also stated that for photographs he took personally, it was his custom to write information about them on pieces of tissue paper that were used to separate film plates. (*Id.* ¶ 14.) This information was later used to register copyrights to the photographs with the U.S. Copyright Office. (*Id.* ¶¶ 14–15.) But for images shot by a staff photographer, Adlife listed as its author the director of photography at the time the photograph was taken. (*Id.* ¶ 16.)

Mr. Albrizio also sought to explain why copyrighted photographs attributed to Mr. Ciolfi were "created" years after he had left Adlife. He began by describing Adlife's three-step process for adding an image to its food photography library. (*Id.* ¶¶ 19–22.) First, an Adlife employee would sketch the food item to be photographed. (*Id.* ¶ 19.) Then the kitchen would cook the food and style it before an Adlife photographer took photographs of it. (*Id.*) The last step involved color correcting and color separating the images so they would be consistent with the other photographs in Adlife's library. (*Id.*) According to Mr. Albrizio, there was often a years-long gap

between the second and third steps in the process because Adlife would leave many of the photographs unfinished until they were needed for publishing at a later date. (*Id.* ¶¶ 20–21.) The "creation date" listed on copyright registrations with the U.S. Copyright Office reflected the date when step three of the process was completed. (*Id.* ¶ 21.) Hence, there could be a significant lapse in time between when a photographer shot the image and when it was "created" for purposes of the copyright registration. (*Id.*)

In moving for summary judgment, MyWebGrocer concedes that the court generally does not assess credibility of witnesses at the summary judgment stage. (Doc. 91 at 20.) In support of its argument that this case is an exception to that rule, MyWebGrocer cites to *Jeffreys v. City of N.Y.*, 426 F.3d 549 (2d Cir. 2005). In *Jeffreys*, the Second Circuit held that summary judgment was proper because the opposing party relied "almost exclusively" on its own testimony, which was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations." *Id.* at 551. MyWebGrocer contends that "[t]his is such a case where Adlife's assertions, even at the summary judgment stage, cannot be credited in view of its lack of critical proof and its inconsistent and contradictory discovery responses." (Doc. 91 at 20–21.)

The court disagrees. In *Jeffreys*, the defendant alleged that he was beaten by several police officers on his head, body, and arms with a flashlight, causing him to lose consciousness. *Id.* at 552. He inferred, but did not recall, that the police officers must have thrown him out of a third-story window because he awoke on the pavement directly beneath it with searing pain in his leg. *Id.* This testimony directly contradicted three prior statements to medical personnel and law enforcement officials in which he said that he had jumped out of the window. *Id.* The defendant was also unable to identify any of the police officers involved in the alleged abuse,

11

and at least two doctors found no evidence of head trauma. *Id.* at 552–53. In affirming the district court's ruling, the Second Circuit found that "even after drawing all inferences in the light most favorable to the plaintiff . . . 'no reasonable person could believe Jeffreys's testimony.'" *Id.* at 555 (quoting *Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 477 (S.D.N.Y. 2003)).

This case is not so exceptional. Adlife does not rely "almost exclusively" on Mr. Albrizio's testimony because it also has possession of the copyright certificates. Although the certificates do not create a presumption of validity for the copyrights covering the Food Images, they may nonetheless carry evidentiary weight in support of Adlife's claims. *See* 17 U.S.C. § 410(c). And while it is true that MyWebGrocer has identified inconsistencies in Mr. Albrizio's statements, Mr. Albrizio has provided plausible explanations for many of these discrepancies. *See Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 106 (2d Cir. 2011) (quoting *Jeffreys*, 426 F.3d at 555 n.2) (finding that "if there is a plausible explanation for discrepancies in a party's testimony, the court considering a summary judgment motion should not disregard the later testimony because an earlier account was ambiguous, confusing, or simply incomplete"). These inconsistencies cast doubt on Adlife's claim to valid ownership of the copyrights, but they are not so flagrant that it would be impossible for a reasonable jury to believe Mr. Albrizio's statements. Accordingly, this court declines to apply the *Jeffreys* exception to the general rule forbidding the evaluation of witness credibility at the summary judgment stage. *See, e.g.*, *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11 (2d Cir. 2014); *Gilmore v. Fitzmaurice*, No. 9:16-cv-1300, 2018 WL 4178227, at *10 (N.D.N.Y. May 31, 2018); *Meng Meng Lin v. City of N.Y.*, No. 16-cv-2270, 2018 WL 4119207 at *4 (E.D.N.Y. Aug. 29, 2018).

For the reasons discussed above, there is a genuine factual dispute as to whether Mr. Albrizio and Mr. Ciolfi photographed the Food Images attributed to them and whether they did

so within the scope of their employment at Adlife. This dispute of fact is "material" for summary judgment purposes because it is necessary determine whether Adlife has valid ownership of the copyrights covering the Food Images. The court therefore denies the parties' competing motions for summary judgment on the issue of liability for copyright infringement.

## III.    Damages for Copyright Infringement Claim

MyWebGrocer argues in its amended complaint that, should Adlife meet its burden in proving copyright infringement, such infringement was not willful and any remedy should not exceed the market value for each copyrighted image found to be infringed. (Doc. 10 ¶ 43.) In its counterclaim for copyright infringement, Adlife seeks to recover "statutory damages against [MyWebGrocer] in an amount up to $150,000.00 for each infringement pursuant to 17 U.S.C. § 504(c) or actual damages and profits . . . in an amount to be proven for each infringement pursuant to 17 U.S.C. § 504(b)." (Doc. 47 at 20.) Adlife also contends it is entitled to the costs of litigation and reasonable attorney's fees under 17 U.S.C. § 505. *Id.*

MyWebGrocer moves for partial summary judgment on the issue of damages as it relates to both parties' copyright infringement claims. (Doc. 92.) Specifically, MyWebGrocer contends the court should grant partial summary judgment on Adlife's claims for "(1) MyWebGrocer's profits, (2) actual damages, (3) statutory damages, and (4) attorneys' fees." (Doc. 92 at 3.) The court only considers the final three categories because Adlife does not seek to compel MyWebGrocer to disgorge any profits. (Doc. 106 at 3.) Nor does Adlife seek recovery of damages for the Brisket Photograph and Tuna Sandwich Photograph because it did not include them in its counterclaim for copyright infringement. (*Id.* at 6.) The issue of damages therefore only pertains to the five Food Images still in controversy: (1) Pork Ribs Photograph, (2) Sausage

Pasta Photograph, (3) Turkey Ham Wrap Photograph, (4) Mangoes Photograph, and (5) Cherries Photograph.

### A. Actual Damages

Under 17 U.S.C. § 504(b), "[t]he copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement." *Id.* Although the statue does not define actual damages, Professor Nimmer writes that "[a]ctual damages represent the extent to which infringement has injured or destroyed the market value of the copyrighted work at the time of infringement." 4 Nimmer on Copyright § 14.02[A]; *see also Fitzgerald Publ'g Co. v. Baylor Publ'g Co.*, 807 F.2d 1110, 1118 (2d Cir. 1986). The Second Circuit has held that "actual damages may include in appropriate cases the reasonable license fee on which a willing buyer and a willing seller would have agreed for the use taken by the infringer." *On Davis v. The Gap, Inc.*, 246 F.3d 152, 167 (2d Cir. 2001). To establish actual damages from an infringer's failure to pay a license fee, "the owner must show that the thing taken had a fair market value." *Id.* at 166.

MyWebGrocer argues that Adlife cannot prove actual damages because it relies only on its own subjective estimate of what it would charge an alleged infringer for a licensing fee. (Doc. 92 at 17.) The court rejects this argument. Because it is undisputed that Adlife has charged clients a minimum subscription fee of $999 per month for access to its food photography library (Doc. 107 ¶ 166), Adlife can offer evidence that the Food Images have a fair market value. *See On Davis*, 246 F.3d at 172 (finding that the plaintiff demonstrated a fair market value for his work because he had previously licensed it for a use similar to the one taken by the infringing defendant). The mere possibility that MyWebGrocer may have decided against using the Food Images had it known that it would have to pay $999 per month is not a bar to recovery of actual damages. *See id.* at 171–72 ("[W]hether the infringer might in fact have negotiated with the

owner or purchased at the owner's price is irrelevant . . . [t]he honest purchaser is hypothesized solely as a tool for determining the fair market value of what was illegally taken." (citing 2 Paul Goldstein, *Copyright* § 12.1.1.1, at 12:13 (2d ed. 2000))). MyWebGrocer is free, of course, to offer its own evidence that $999 is an inflated figure. Based on the summary judgment record, however, the court must deny MyWebGrocer's motion for partial summary judgment on the issue of actual damages.

### B.    Statutory Damages

Under § 504(c)(1) of the Copyright Act, "the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages." 17 U.S.C. § 504(c)(1). Statutory damages are not available if the infringement began "after first publication of the work and before the effective date of its [copyright] registration, unless such registration is made within three months after the first publication of the work." 17 U.S.C. § 412.

The court has "wide discretion" to award statutory damages for each work infringed in an amount it "considers just," so long as the amount falls within the statutory minimum of $750 and maximum of $30,000. *Fitzgerald Publ'g Co.*, 807 F.2d at 1116; 17 U.S.C. § 504(c)(1). But if the copyright owner can prove the infringement was "willful," the court may award damages of up to $150,000. 17 U.S.C. § 504(c)(2). An infringement is "willful" when the defendant "had knowledge that its conduct represented infringement or . . . recklessly disregarded the possibility." *Bryant v. Media Right Prods., Inc.*, 603 F.3d 135, 143 (2d Cir. 2010) (alteration in original) (quoting *Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366 (2d Cir. 1993)). On the other hand, the court may award as little as $200 in statutory damages if the infringer proves it "was not aware and had no reason to believe that [its] acts constituted an infringement,"

17 U.S.C. § 504(c)(2). "In other words, a defendant can claim the defense of 'innocent intent' to reduce the amount of statutory damages." *Fitzgerald Publ'g Co.*, 807 F.2d at 1115.

MyWebGrocer argues it is entitled to summary judgment on the issues of innocent infringement and willfulfulness, asserting that any infringement of the Mangoes Photograph, Cherries Photograph, Sausage Pasta Photograph, and Pork Ribs Photograph was innocent.[2] (Doc. 92-1 at 19–20.) Relying on *Bryant v. Media Right Productions, Inc.*, MyWebGrocer contends that its alleged infringement of the Mangoes Photograph and Cherries Photograph was innocent because it acted under an express warranty from its customers that the images were properly licensed. (*See id.* at 19.) The court agrees. In *Bryant*, the defendant copied and sold two copyrighted music albums without authorization. 603 F.3d at 137. The *Bryant* court affirmed the district court's ruling that the defendant had innocently infringed the copyrights because it had relied on a distribution agreement with a production company, which warranted that the defendant's "use of the [a]lbums in accordance with the [a]greement would not infringe any copyrights." *Id.* at 143.

Here, it is uncontested that the entities Piggly Wiggly and Key Foods provided the Mangoes Photograph and Cherries Photograph, respectively, to MyWebGrocer. (Doc. 107-9 ¶¶ 56, 69.) In master services agreements with MyWebGrocer, each customer warranted that:

> [I]t has or has obtained from third parties all necessary rights for [MyWebGrocer] to use [any materials provided by the customer, including images] . . . as contemplated by the parties under this Agreement and that all [materials, including images] . . . under this Agreement do not and will not give rise to or result in any infringement or misappropriation of any patent, copyright, trade secret or any violation of any other intellectual property right or any other right of a third party.

---

[2] It is undisputed that Adlife cannot recover statutory damages for the Turkey Ham Wrap Photograph because MyWebGrocer's alleged infringement began after it was first published and before the date of copyright registration. (Doc. 106-1 at 5.)

(Doc. 107-9 ¶¶ 60, 73.) Following the reasoning in *Bryant*, MyWebGrocer's reliance on the master services agreements establishes that any infringement of the Mangoes Photograph and Cherries Photograph was "innocent" (and therefore not "willful") for statutory damages purposes. *See* 603 F.3d at 143.

Adlife nonetheless argues that MyWebGrocer willfully engaged in infringing conduct independent of its customers when using the Mangoes Photograph and Cherries Photograph. (Doc. 106-1 at 9–11.) Adlife points to Mr. Tarrant's deposition testimony, in which he described how MyWebGrocer "crops," "separates," "dissects," and "derives" individual photographs from PDF circulars sent to them by their customers. (*Id.* at 10–11.) According to Adlife, "[e]ven if MyWebGrocer has a good faith belief that the PDF circulars are properly licensed, as a sophisticated user of intellectual property, MyWebGrocer is no doubt aware that the conduct described above would not be permitted by standard stock licenses." (*Id.* at 11; *see also id.* at 9 (asserting that "stock photo licensing . . . generally prohibits manipulation of content and creation of derivative works").

The question of whether MyWebGrocer created unauthorized derivative works based on the Cherries Photograph and Mangoes Photograph has no bearing on whether MyWebGrocer willfully violated Adlife's copyrights. The images extracted from the PDFs may constitute derivative works based on the Cherries Photograph and Mangoes Photograph, but MyWebGrocer nevertheless reasonably believed that its customers had obtained the rights to use the images in this way. The master service agreement provides that the customers had obtained the rights for MyWebGrocer to use "*any materials* provided by [the customer]." (Doc. 93-54 at 2.) Even when construed in the light most favorable to Adlife, this language is broad enough to encompass not only the original Cherries Photograph and Mangoes Photograph but also their reproduction in the

customers' circulars. The court therefore concludes that MyWebGrocer's alleged infringement of the Mangoes Photograph and Cherries Photograph was innocent.

MyWebGrocer also contends that any infringement of the copyrights for the Sausage Pasta Photograph and Pork Ribs Photograph was innocent. (Doc. 92-1 at 20.) According to MyWebGrocer, it could not have known it was potentially infringing the Sausage Pasta Photograph's copyright because it did not display the image on its customer's website. (*Id.* at 20–21.) MyWebGrocer also asserts that its specific use of the Pork Ribs Photograph was contemplated in its licensing agreement with Multi-Ad. (*Id.* at 21.)

However, Adlife disputes MyWebGrocer's statement that it did not display the Sausage Pasta Photograph on its customer's website. (*See* Doc. 107 ¶ 36.) Adlife also disputes MyWebGrocer's assertion regarding the Pork Ribs Photograph, stating that MyWebGrocer continued to use the photograph after the expiration of its license agreement with Multi-Ad. (*See id.* ¶ 21.) Furthermore, the court is mindful that "caution must be exercised in granting summary judgment when state of mind is in issue." *Res. Developers, Inc. v. Statue of Liberty-Ellis Island Found., Inc.*, 926 F.2d 134, 141 (2d Cir. 1991). For these reasons, the court does not make a determination at the summary judgment stage as to whether MyWebGrocer's presumed infringement of the Sausage Pasta Photograph and the Pork Ribs Photograph was either innocent or willful.

### C.    Attorney's Fees

The prevailing party in a copyright infringement action may recover reasonable attorney's fees. 17 U.S.C. § 505. However, 17 U.S.C. § 412 bars recovery of attorney's fees (and, as discussed above, statutory damages) if the infringement occurs after first publication of

the work and before the effective date of copyright registration unless such registration is made within three months of first publication. *Id.*

MyWebGrocer claims it is entitled to summary judgment on Adlife's claim for attorney's fees regarding the Turkey Ham Wrap Photograph, the Brisket Photograph, and the Tuna Sandwich Photograph. (Doc. 92-1 at 22.) The Turkey Ham Wrap Photograph is included in MyWebGrocer's claim for declaratory relief of non-infringement as well as Adlife's counterclaim for copyright infringement. The Brisket Photograph and Tuna Sandwich Photograph are only a part of MyWebGrocer's declaratory relief claim.

MyWebGrocer argues that § 412 bars recovery of attorney's fees for these images because any infringement occurred after the works were first published and before their copyrights were registered. *Id.* In reply, Adlife contends § 412 only limits an award of attorney's fee as costs to a plaintiff, and that the section does not apply to any claim by a prevailing defendant. (Doc. 106-1 at 15.) Adlife asserts it could recover attorney's fees as the prevailing defendant in MyWebGrocer's declaratory relief claim even if it were to be barred from doing so as the prevailing plaintiff in its counterclaim. (*Id.* at 16.)

To support its argument, Adlife cites to *Lucas v. Wild Dunes Real Estate, Inc.*, 197 F.R.D. 172 (D.S.C. 2000), which states that "§ 412 only limits an award of attorneys' fees as costs to a plaintiff when the copyright infringement occurred before registration; § 412 is inapplicable to any claim by a defendant for attorneys' fees." *Id.* at 177. This generally holds true so long as the defendant is also the alleged infringer, as in *Lucas. See Latin Am. Music Co. v. Am. Soc'y of Composers, Authors & Publishers (ASCAP)*, 642 F.3d 87, 90 (1st Cir. 2011) ("Section 412 thus does not, logically, apply to alleged infringers."); 4 Nimmer on Copyright § 14.10[B][2] ("[N]othing on the face of [§ 412] bars awarding fees to" a prevailing defendant

accused of copyright infringement). Section 412 only applies to the copyright owner (which is usually the plaintiff) because it is the party that has registered the copyright in question. As the court in *Latin Am. Music Co.* observed, "[a] defendant accused of infringing someone else's copyright could not possibly comply with the statute's registration criterion." *Id.* at 90.

However, a defendant-copyright owner—such as Adlife in MyWebGrocer's claim for declaratory relief—would be in as good a position to comply with § 412's registration criterion as a plaintiff-copyright owner. The court therefore sees no reason why § 412 should not apply to Adlife simply by virtue of its status as the defendant rather than the plaintiff in MyWebGrocer's declaratory relief claim. The court therefore finds that, under § 412, Adlife cannot recover attorney's fees for the Turkey Ham Wrap Photograph, the Brisket Photograph, and the Tuna Sandwich Photograph.

## IV.    VCPA Claim

In Count II of its amended complaint, MyWebGrocer claims that Adlife has engaged in "an unfair or deceptive act of practice in commerce" in violation of the VCPA. (Doc. 10 ¶ 47.) Specifically, MyWebGrocer alleges that Adlife used a computerized image matching system to send individuals and businesses notices demanding $8,000 for copyright infringement even though it knew that in many cases the recipients likely owned valid licenses to use the images. (*Id.*) It states this practice has caused actual damage to MyWebGrocer and others similarly situated to MyWebGrocer by causing them to spend time and money responding to these notices. (*Id.* ¶¶ 51–52.) MyWebGrocer also states that this conduct has damaged its reputation with its customers. (*Id.*)

Adlife moves for summary judgment on MyWebGrocer's VCPA claim, maintaining that it could not have engaged in deceptive or harmful practices because MyWebGrocer did in fact engage in copyright infringement. (Doc. 95-37 at 23.)

The VCPA prohibits "[u]nfair methods of competition in commerce and unfair or deceptive acts or practices in commerce." 9 V.S.A. § 2453. A VCPA claim may be filed by any consumer. 9 V.S.A. § 2461(b). To record damages, the consumer must contract for goods or services "in reliance upon false or fraudulent representations or practices . . . or sustain[ ] damages or injury as a result of [such] representations or practices." 24 V.S.A. § 2461(b).

Adlife previously moved to strike MyWebGrocer's VCPA claim pursuant to Vermont's anti-SLAPP statute, 12 V.S.A. § 1041. (Doc. 34.) This court denied that motion. (Doc. 46.) Adlife also moved for partial judgment on the pleadings regarding MyWebGrocer's VCPA claim pursuant to Federal Rules of Civil Procedure 12(c). (Doc. 64.) That motion was denied as well. (Doc. 89.) The court found that the allegations in MyWebGrocer's amended complaint, when accepted as true, were "sufficient to establish that [Adlife] is alleged to be engaged in a scheme of deceptive practices in which it seeks to recover money from persons who may actually owe it little or nothing." (*Id.* at 11–12.)

In reviewing Adlife's motion for summary judgment, the court applies the same legal standard as it did in Adlife's motion for judgment on the pleadings. *See* Arthur R. Miller et al., *Federal Practice and Procedure* § 1369 (3d ed. 2019) ("the standard applied by the court appears to be identical under both [Rule 12(c) and Rule 56] motions"). Adlife's arguments, however, have changed. In its motion for judgment on the pleadings, Adlife asserted that MyWebGrocer lacked standing to bring a private claim under the VCPA. (Doc. 65 at 8.) In its motion for summary judgment, Adlife now argues that MyWebGrocer's VCPA claim must fail

because Adlife has "conclusively established" that MyWebGrocer infringed Adlife's copyrights. (Doc. 95-37 at 23.)

The court is unmoved by Adlife's latest attempt to dismiss MyWebGrocer's VCPA claim. Adlife's argument relies on the court finding for Adlife on its summary judgment motion for copyright infringement. But, as discussed above, the court has found that a genuine factual dispute exists regarding the parties' copyright infringement claims. Thus, the court denies Adlife's motion for summary judgment on MyWebGrocer's VCPA claim.

## Conclusion

The parties' competing motions for summary judgment pertaining to liability for copyright infringement (Docs. 91, 95) are DENIED.

MyWebGrocer's motion for summary judgment on the issue of damages (Doc. 92) is GRANTED in part and DENIED in part. MyWebGrocer's motion pertaining to Adlife's claim for actual damages is denied. Its motion for statutory damages on the issue of innocence is granted as it relates to the Turkey Ham Wrap Photograph, Cherries Photograph, and Mangoes Photograph, but denied with respect to the Sausage Pasta Photograph and the Pork Ribs Photograph. MyWebGrocer's motion on the issue of attorney's fees is granted.

Adlife's motion for summary judgment on MyWebGrocer's VCPA claim (Doc. 95) is DENIED.

Dated at Rutland, in the District of Vermont, this _27_ day of August, 2019.

Geoffrey W. Crawford, Chief Judge
United States District Court